## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## EASTERN DIVISION

DAVID EUGENE BREEZEE,      )
           )
           )
      Petitioner,      )
           )
v.           )      No. 1:17-cv-01207-STA-jay
           )
GRADY PERRY,      )
           )
      Respondent.      )

---

## ORDER DENYING REMAINING CLAIM,
## DENYING § 2254 PETITION,
## DENYING CERTIFICATE OF APPEALABILITY,
## AND
## DENYING LEAVE TO APPEAL *IN FORMA PAUPERIS*

---

Petitioner David Eugene Breezee filed a *pro se* habeas corpus petition (the "Petition") pursuant to 28 U.S.C. § 2254.  (ECF No. 1.)  Respondent Grady Perry filed a response to the Petition opposing relief.  (ECF No. 16.)  Upon review of the state court record and the parties' arguments, the Court denied the Petition and denied a certificate of appealability ("COA").  (ECF No. 22.)  On appeal, the Sixth Circuit granted Petitioner a limited COA and ultimately remanded the case for merits review of Petitioner's claim under *Brady v. Maryland*, 373 U.S. 83 (1963). (ECF No. 28.)  For the following reasons, the sole remaining claim is **DENIED**.

## BACKGROUND

### I.    State Court Trial and Direct Appeals

In June 2010, the Benton County, Tennessee, Grand Jury returned a four-count indictment charging Breezee with the sexual abuse of his two stepdaughters.  (ECF No. 15-1 at 2-6.)  Counts 1 and 2, which related to the younger stepdaughter, D.W., charged Petitioner with, respectively,

rape of a child in violation of Tenn. Code Ann. § 39-13-522(a), and incest in violation of Tenn. Code Ann. § 39-15-302(a)(1).  (*Id.* at 2-3.)  Regarding his eldest stepdaughter, B.W., Count 3 charged him with rape in violation of Tenn. Code Ann. § 39-13-502(a)(1), and Count 4 charged him with incest. [1]  (*Id.* at 4-5.)  "The trial court severed the offenses . . . involving D.W. from the offenses . . . involving B.W."  *Breezee v. State*, No. W2015-02251-CCA-R3-PC, 2017 WL 1907738, at *1 (Tenn. Crim. App. May 9, 2017) ("*Breezee IV*"), *perm. to appeal denied*, (Tenn. Sept. 22, 2017).

A jury convicted Breezee as charged in the case involving B.W.  *State v. Breezee*, No. W2011–01231–CCA–R3–CD, 2012 WL 6728345, at *1 (Tenn. Crim. App. Dec. 28, 2012) ("*Breezee II*"), *perm. to appeal denied*, (Tenn. May 14, 2013).  He was sentenced to ten years' imprisonment.  *Id.*

Petitioner was tried before a jury in August 2011 on the charges relating to D.W.  (ECF No. 15-14.)  Sgt. Ricky Pafford from the Benton County, Tennessee, Sheriff's Department testified that on February 26, 2010, he accompanied Department of Children Services ("DCS") social worker Cendy Curtis to D.W.'s school to "investigat[e] some inappropriate touching of a juvenile."  (*Id.* at 18.)  He and Curtis spoke with D.W. and she "provided . . . a written statement of the happenings that went on."  (*Id.*)  Pafford later interviewed Breezee at the sheriff's office for "three or four hours."  (*Id.* at 20.)  Curtis also attended the interview.  (*Id.* at 19.)  Pafford's goal "was [to] learn[] about the dynamics of the family.  How everybody got along.  Just the normal day to day function of the family."  (*Id.* at 20.)  Breezee maintained throughout the interview that he was innocent.  (*Id.* at 35-36.)

---

[1] B.W. is sometimes referred to as "B.J" in the state court record.  Where D.W. is referred to by her first or first and last name in the trial transcript or in exhibits, this Court has replaced those references with "D.W." or "D[]" or "D[] . . . W[]" when quoting from those sources.

Pafford testified that he interviewed Petitioner a second time on another day.  (*Id.* at 20.)

The interview lasted three or four hours.  (*Id.*)  When confronted with the allegations against him,

Breezee "acted surprised, shocked that his stepdaughter would make allegations against him."

(*Id.*)  When Petitioner was asked a question, Pafford would "write it down before [they] went to

the next one."  (*Id.* at 33.)  Each question-response was numbered (the "Paragraphs") and Breezee

initialed each Paragraph and signed the document (the "Written Statement") after having read

them.  (*Id.* at 27.)  The Written Statement was admitted into evidence.[2]  Pafford read several of the

Paragraphs in open court:

Q.  All right. Would you read Number 4?

A. What are we going to do to help you.  That was the question.  And the answer was: I
don't know.

Q. Number 5.

A. Do you not think your side should be told.  Mr. Breezee's answer was: Yes.

Q. Number 6.

A. If you was going to fix the girl, how would you fix them?  His answer was: I don't
know.

Q. Number 10.

A. Did you think when you were touching the girl that it would not hurt her?  His answer
was: I don't know what I was thinking.

Q. Number 12.

A. You understand that what you done was breaking the law.  His answer was: Yes.
Touching a kid is breaking the law.

---

[2] The second interview centered around the allegations regarding both D.W. and B.W.
However, because the cases were severed, the judge at the trial relating to the rape of D.W. allowed
redactions to the Written Statement.  Defense counsel objected to certain redactions on the ground
that some of Breezee's statements might have applied only to B.W., not D.W.  The court overruled
the objection.  (*See* ECF No. 15-14 at 22-23.)  The Written Statement was admitted into evidence
as Exhibit 1 and the unredacted version, at defense counsel's request, was marked Exhibit 1A but
not entered into evidence.  (*Id.* at 24; ECF No. 15-15 at 2-5 (Ex. 1 & Ex. 1A.)

(ECF No. 15-14 at 27-28.)

Pafford further testified that the second interview "ended with what [he] thought was a confession of what happened." (*Id.* at 21.) Specifically, he recalled that Breezee stated, "I don't know why I touched the girl" and cried. (*Id.* at 21, 29.) The interview ended and Pafford placed Petitioner under arrest. (*Id.* at 29.) The officer then accompanied Breezee "outside and . . . allowed him to smoke before [they] went to the jail." (*Id.*)

On cross-examination, Pafford confirmed that neither interview was recorded and that Breezee denied any wrongdoing at the first session. (*Id.* at 30, 34-35.) The officer further explained that there was no recording of the second interview because the recorder "malfunctioned." (*Id.* at 30.) Pafford conceded that he did not write down Breezee's statement that he did not "know why [he] touched the girl." (*Id.* at 36.)

Lieutenant Bryant Allen from the Benton County, Tennessee, Sheriff's Department testified that on the day of the second interview, Sgt. Pafford "came to [him] and said, can you go in and talk to [Breezee] and see what you can find out because he wasn't getting anywhere." (*Id.* at 45.) Allen then attended the second interview for "probably 15 minutes." (*Id.*) The officer recalled that "[a]t the end of the interview [he] asked [Breezee] why he had touched the girl. And [Breezee]—just put his head down and said, I don't know why I touched the girl." (*Id.*) He confirmed that Breezee "just put his head in his hands and sobbed." (*Id.*) Allen acknowledged that the interview was not recorded. (*Id.* at 44.) He explained that he "did . . . attempt to record this interview," but the "new recording device . . . for some reason it didn't work." (*Id.*)

On cross-examination, the officer testified that "Pafford was taking the notes and writing down" the questions and answers. (*Id.* at 49.) He agreed that Breezee's statement "I don't know

4

why I touched the girl" should have been written down because the remark was "pretty important." (*Id.* at 50.)

Cendy Curtis testified that "she received a report [about D.W.] on February 25, 2010." (*Id.* at 53.) "[T]he following day" she "went to [the victim's] school" with Sgt. Pafford "to talk to the child." (*Id.* at 54.) "The child was not at school" so they "went to her home." (*Id.*) Curtis spoke with D.W., but the victim "really didn't give [her] much information at that point." (*Id.*). Curtis "felt like there was a lot of stuff going on in the home that shouldn't be." (*Id.* at 55.) She asked D.W.'s mother to bring D.W. to the DCS offices "so [the victim] could be interviewed privately away from her mother." (*Id.*) After D.W. "disclos[ed]" to Curtis that she had been "sexual [sic] abused," Curtis took her "written statement." (*Id.*)

Curtis further testified that, "at a later date," she and Sgt. Pafford interviewed Breeze. (*Id.* at 56.) She confirmed that the interview "was the first interview" and that during that session Petitioner never "admit[ted] to anything." (*Id.*) However, she did hear Breezee confess after the second interview:

Q. Did you ever hear [Breezee] admit to anything?

A. Yes. I did hear him confess to molesting [D]. . . [W].

Q. Okay. When did that happen?

A. Outside. He had confessed to Investigator Pafford and Officer Bryant Allen. He had confessed to them and they contacted me and told me. So I went to the sheriff's department and I met Ricky—Investigator Pafford and Mr. Breezee as they came outside.

The officer brought [Breezee] out to smoke. And I spoke briefly with Mr. Breezee at that point who did admit that he had molested [D]. . . [W] and that he did not know why he had done that to her.

(*Id.* at 56-57.)

Curtis recalled that she had talked to D.W. "approximately" " a year before" she conducted her 2010 investigation.  (*Id.*)  D.W. did not "make any allegations" at that time.  (*Id.*)  Curtis explained that the victim was "afraid to tell because she had been instructed not to."  (*Id.* at 58.)

On cross-examination, Curtis confirmed that at the first interview Breezee "emphatically denied that he did anything."  (*Id.* at 60.)  She admitted that she never recorded in a written report that D.W. had told her during the 2010 investigation that she had been too afraid to confirm the abuse during the previous investigation.  (*Id.* at 66.)  Curtis explained that she was relying only on her memory of what D.W. told her.  (*Id.* at 68.)  The witness acknowledged that in 2009 D.W. "denied that she ever had any sexual abuse[.]"  (*Id.* at 69.)

Shane Penn, Breezee's former cellmate, testified about a confession he heard Breezee make while incarcerated.  (*Id.* at 77-78.)  Penn recalled that  petitioner "at first" insisted that "he was wrongly accused[.]"  (*Id.* at 79.)  However, he later heard Breezee "talking to another inmate" about his case.  (*Id.*)  Penn was at first reluctant to provide a description of the confession in open court, but he did so when pressed:

Q.  All right.  Did you hear [Breezee] specifically talking about what he did to [D.W.] his step-daughter, 12-year-old?

A. I mean, like before—like I said in my statements and whatnot, I mean, I didn't get great detail.  But I got enough to know that what he did was wrong.  I mean--

Q. "What did [Breezee] say he did?"

A.  Most I heard of it something about going into the living room, her being asleep on the couch, and basically just straight up molesting.  You know, I mean.

Q. Okay.  In what way?  Was there a specific way?  Did he say a specific way?

A. Well, I don't really like coming out with that word just saying it.

[PROSECUTOR]: Your Honor, would you want him to use the first letter to see if we could figure out how—

THE COURT: I don't know what he's going to say yet.

6

THE WITNESS: Well, oral sex, should I say. I mean, that pretty much covers it.

Q. (By [the prosecutor]): What did he say about that?

A. Well, he went to the couch, climbed up with her, pinned her in, started doing it. The oral.

(ECF No. 15-14 at 80-81.)

Penn testified that he later assaulted Breezee "[f]or what he did" to the victim. (*Id.* at 84.) He explained that he "got tired of hearing about it. At the beginning of it you didn't do it. The next minute he did and he liked it. It struck a nerve. It was all I—the last straw on the camel's back so to speak." (*Id.* at 84-85.) The witness acknowledged that he told Cendy Curtis about Breezee's confession after he was released from jail. (*Id.* at 82-83.) He conceded that he subsequently regained custody of his son from DCS. (*Id.* at 86.) Penn explained that Curtis had asked him about the charge he "caught" for assaulting Breezee because "them giving custody of my kid they want to know stuff like that." (*Id.* at 84.) Breezee's confession "c[a]me up because of the assault charge." (*Id.*)

On cross-examination, Penn again acknowledged that he had regained custody of his son and also affirmed that he had received a sentence of "thirty days" on the assault conviction. (*Id.* at 89.) He further confirmed that jail inmates keep their legal papers near their mattresses. (*Id.* at 91.) He was asked whether he obtained information about the abuse of D.W. from Breezee's "General Sessions warrant," which charged him with "performing oral sex on [D.W.] when she was 12 years old":

Q. What you've testified to is in his General Sessions warrant. . . . is that not right?

A. You say it says it there, it says it there. I know what I heard with my own two ears.

Q. Did you look at any of those papers? Did you look at that paper?

A. I ain't got no reasons to. I know what I heard.

(*Id.*)

7

The victim's mother, Tiffany Chaney, testified that, on February 12, 2007, she "walked in on the Petitioner's performing oral sex on D.W." *Breezee IV*, 2017 WL 1907738, at *1. She provided the following details of the event:

A. I woke up suddenly and David wasn't in the bed. And I felt something wasn't right. So I got up and creeped (sp) down the hall. And as I rounded the end of the hallway I seen David's back and he was kneeled down in front of [D.W.].

Q. Where was [D.W.]?

A. She was on the couch.

Q. What, if anything, was happening?

A. Do what?

Q. What if anything, was happening at that time?

A. David was licking her vagina and had his fingers in her.

Q. Now, how close were you? You said you saw his back you saw these things. How close were you?

A. I was right on top of him when he had realized I was there.

Q. Okay. You said when he realized that you were there. So what did he do when he realized you were there?

A. He jumped up and told me to get the gun.

Q. Get the gun?

A. Uh-huh.

Q. Why?

A. Because I had made the statement that if anyone touched my children that I would shoot them.

Q. So he told you to go get the gun?

A. (Affirmative nodding of the head.)

Q. Did you?

A. No.

(ECF No. 15-14 at 95-97.)

When asked to describe in more detail about how D.W. and Breezee were positioned and what Breezee was doing when she walked in on the abuse, Chaney testified:

Q. Now, when you went into that room and you saw his back, you saw what he was doing, you've already testified what he was doing with his mouth.

A. Yes, sir.

Q. Where—how was [D.W.] positioned?

A. She was laying on the couch.  She was pulled down just where her buttock was off the couch and David had her hands and he was between her legs where she couldn't move them.

Q. How much light was in that room?

A. It wasn't lit up, it wasn't bright.  But there was plenty of light from the kitchen.

Q. Any doubt in your mind what you saw?

A. No doubt.

Q. What about what you heard?

A. No doubt.

Q. How many times—you said that Mr. Breezee told you that he was sorry.  How many times did he tell you that?

A. Several.

(*Id.* at 100-101.)

Chaney further testified that she sent D.W. and B.W. to a friend's house for a few days. (*Id.* at 97-98.)  Chaney explained that she stayed at the home with Breezee because she was scared of him "[b]ecause he . . . threatened to kill [her] before."  (*Id.* at 98.)  Upon D.W.'s return home, Breezee "hugged [D.W. and Chaney] and he said that he was sorry.  That he would never do it again and never meant to hurt her."  (*Id.* at 101.)  Chaney did not report Breezee to the police because she was afraid of losing her children.  (*Id.* at 100.)  She explained that Petitioner had previously threatened that "he would kill [her] before [she] would ever take his son."  (*Id.*)  She said she "wait[ed] so long to come forward" because she "was scared" of Petitioner.  (*Id.* at 102.)  Chaney recalled that after D.W. returned home, she did not "leave [her] alone with Mr. Breezee" and "quit sleeping."  (*Id.* at 102.)

On cross-examination, Chaney acknowledged that D.W. "was upset" that the family was planning to move to another town because D.W. wanted to remain living near her boyfriend.  (*Id.* at 105.)  She also affirmed that Breezee was a truck driver in 2007 and that she wrote him a letter in October of that year with an enclosed picture of the children "so he would have them with him when he was driving the truck."  (*Id.* at 107.)  When asked whether his absences while working would have provided "a great opportunity to leave" him Chaney said, "Good opportunity if you have the money."  (*Id.* at 108.)  Chaney admitted that she "mess[ed] around with" a registered sex offender "while [Breezee] was on the road."  (*Id.* at 110.)  She acknowledged that when she spoke with Cendy Curtis in 2009 that she did not tell Curtis that she had seen Breezee performing oral sex on D.W. in 2007.  (*Id.* at 111.)  She explained that she did not report the abuse because she "believed he had not done it again."  (*Id.*)

The victim "testified that one night in 2007, when she was twelve years old, she awoke with her shorts and undergarment on the floor and the Petitioner's tongue in her vagina." *Breezee IV*, 2017 WL 1907738, at *1. She recounted the event, including details as to how, exactly, Breezee held her down and what occurred that made him stop the abuse:

A. I was asleep on the couch and I woke up with David—with my shorts and my undergarment on the floor next to the couch with David—with his head down between my legs.

Q. When you say David, who are you referring to?

A. My stepfather.

Q. David Breezee?

A. Yes.

Q. I know this is hard. So take your time. Breathe deep. What was he doing?

A. He had his tongue in my vagina.

Q. What did you do about that?

A. When I noticed I tried to push him off with my hands, but he took his hand and moved both my wrists to the side of the couch and took his other arm and moved his shoulder against my leg and pushed it out so I couldn't close them.

Q. So you couldn't move?

A. No.

Q. Did he say anything to you?

A. He was just telling me to shh.

Q. Did you shh?

A. Yes.

Q. What choices did you have at 12 years old?

A. I'd either listen or get in trouble.

A. How long did this go on?

A. It wasn't like five minutes, but it wasn't thirty either.

*** 

Q. You said his hands made contact with your hands?

A. Yes.

Q. You said his legs made contact or shoulder.  Any other body parts make contact with you down on the couch.

A. His tongue.

Q. How did this end?

A. My mom walked in.

Q. When she walked in, what happened?

A. He looked up at her from what he was doing and got up and they went to the kitchen. They was screaming and fighting.  And my mom told me and my sister to go get our clothes packed because we were leaving.

Q. Did he say anything to you?

A. No.

Q. Did you hear him say anything to your mother?

A. He just said, I'm sorry, Baby.  I didn't mean to.  I'm sorry.  Kept repeating himself.

(ECF No. 15-14 at 116-119.)

D.W. further testified that, after the rape, "she and her sister went to a friend's house for three days." *Breezee I*, 2012 WL 6717308, at *4.  While away, she "spoke with [Breezee] over

the telephone, and [he] told her that she would be in trouble if she did not return home." *Id.* D.W. explained that she "thought she was going to get a beating if she did not go home, so she went back to live with her mother and [Breezee]." *Id.* "When she got home, [Breezee] hugged her and her mother, cried, and told them he was sorry." *Id.* "The victim denied making up the allegations in order to get back at [Breezee] for moving the family to Hollow Rock." *Id.* She also "acknowledged that she was asked about the sexual abuse in 2009," and explained that "she denied the abuse at that time because she though [Breezee] would whip her." *Id.*

On cross-examination, D.W. insisted that Breezee beat her every night for years and "never was overnight anywhere[.]" (ECF No. 15-14 at 127-130; 134.) She acknowledged that she "could be wrong about the year that he left" when defense counsel confronted her with information that Breezee had been out of town on a trip to Atlanta, Georgia, at one point in 2007. (ECF No. 15-14 at 134.) D.W. also "acknowledged that she had a boyfriend at the time of the sexual abuse and that" Breezee "wanted [her] boyfriend to leave, which upset [her]." *Breezee I*, 2012 WL 6717308, at *4; (*see also* ECF No. 15-14 at 125-127.)

The victim was further asked on cross-examination about the possibility that she coordinated her testimony with her mother:

Q. Okay. You and your mom, have you talked about this case?

A. Before when we—we haven't—we don't even talk about it now.

A. But you have in the past you and her talked about it together, haven't you?

A. No. I don't—I don't recall that. I don't think so.

Q. Who have you talked about this case before today?

A. No one. Before this case even came up.

Q. Before right now, who have you talked to about this case? I know there's lots of people you've talked to, but I'm just talking about this case. Who have you talked to?

A. My counselor and then my two best friends.

Q. Okay.  Not your mama?

A. No.

Q. What about the district attorney, you talked to him?

A. Yes.

Q. All right.  What about Cendy Curtis, you talk to her?

A. Yes.  That's legal matter.  Does that matter?

Q. What about the police officer, have you talk [sic] to him?

A. Yes.

Q. Okay.  So there is three or four.  You talked about your testifying, is that right?

A.  Yes.

Q. And—but you didn't talk to your mama about testifying?

A. No.  I mean, she obviously knew I was going to.

Q. Okay.  When was the last time you talked to your mama?

A. About the case or just in general?

Q. Just in general.

A. Today.

Q. Today.  Okay.  But you didn't talk about this case?

A. No.

Q. If she didn't talk about it, you didn't?

A. No.

Q. You didn't talk about what was going to testify or anything like that, right?

A. No.

(ECF No. 15-14 at 130-132.)

On redirect, D.W. further explained her situation:

14

Q. How much access have you had to your mom since this charge was put forth a year ago?

A. Not much.

Q. Who do you live with?

A. I live with my father, Travis: Lewis.

(*Id.* at 133.)

Johnny Sterling testified for the defense that he and the defendant had been in jail at the same time "and that he never heard [Breezee] talk about [his] case." *Breezee I*, 2012 WL 6717308, at *4. He explained "that inmates charged with sex offenses were perceived '[v]ery badly' by other inmates and that sex offenders did not discuss their cases because '[i]t's a sure way to get killed.'" *Id.* (alterations in original). Sterling affirmed that prisoners have possession of "copies of their warrants and that sort of thing often times[.]" (ECF No. 15-14 at 140.) He also acknowledged that when a prisoner "take[s] a shower [he] can't watch [his] stuff like a hawk 24 hours a day[.]" (*Id.* at 146.) The witness conceded that he had not been incarcerated with the defendant "the entire time" the defendant was in jail and "that he did not know what [Breezee] said during the time he was not in jail with [him]." *Breezee I*, 2012 WL 6717308, at *4.

The jury convicted Petitioner of rape of a child and incest. *Id.* The incest conviction was merged into the rape of a child conviction and Breezee was sentenced to twenty-five years' incarceration. *Id.*

On appeal, Petitioner argued "that the evidence [was] insufficient to support the convictions" and "that the trial court erred by ordering him to serve his . . . sentence consecutively to a prior sentence." *Id.* at *5, 7. The Tennessee Court of Criminal Appeals "(TCCA")" rejected the arguments and "affirmed his conviction and sentence for rape of a child in count one, reinstated his incest conviction in count two, and remanded the case to the trial court for resentencing as to both counts." *Breezee IV*, 2017 WL 1907738, at *1. On remand, the trial court re-sentenced

Breezee to a "total effective sentence of thirty-two years" for his convictions relating to both of his stepdaughters. *State v. Breezee*, No. W2013-00798-CCA-R3-CD, 2013 WL 5745677, at *1 (Tenn. Crim. App. Oct. 21, 2013) (*Breezee III*), *perm. appeal denied*, (Tenn. March 4, 2014). Petitioner appealed his sentences but the TCCA affirmed. *Id.*

## II.      State Post-Conviction Proceedings

Breezee filed a *pro se* post-conviction petition in state court, (ECF No. 15-30 at 42-90), which was amended by appointed counsel, (*id.* at 103-113).  Petitioner asserted, among other things, that the State should have disclosed D.W.'s receipt of victim compensation funds and that counsel rendered ineffective assistance by failing to call an individual named "Ronnie Quillen to testify that he slept on Petitioner's couch in February 2007 and that no sexual misconduct occurred[.]" *Breezee IV*, 2017 WL 1907738, at *2.

At the post-conviction evidentiary hearing, Breezee's mother, Barbara Parker, testified that she "found two letters," the first of which "was from the victims' mother to D.W.'s father in which she said she loved him and wanted to be with him." *Id.*  "Ms. Parker said that she did not remember seeing a date on the letter but that the victims' mother wrote the letter while still living with the Petitioner." *Id.*  The second letter, which was dated August 27, 2010, showed that D.W. was paid from the victim compensation fund one year prior to Breezee's trial relating to her abuse. *Id. at* *2 & n.2.

Quillen testified "that he had been friends with the Petitioner for about twenty-five years and that he lived with the Petitioner and the victims' mother 'on several different occasions' for six or eight years." *Id.* at *3. He explained "that the victims' mother was 'always cheating' on the Petitioner, [and] that she even told Mr. Quillen that she loved" him. *Id.* He insisted that Breezee "ain't never touched them kids." *Id.*

16

The post-conviction trial court denied relief on all claims. *Id.* at *4; (*see also* ECF No. 15-30 at 128-30.)   Regarding the nondisclosure issue, the post-conviction judge "ruled that the payment from the crime victims' fund was not probative evidence that D.W. was biased." (ECF No. 28 at 4); (*see also* ECF No. 15-30 at 129.)   The court rejected the claim for the additional reason that, having "had the benefit of hearing" the victim testify, he found her testimony "incredibly persuasive and incriminating against the petitioner."   (ECF No. 15-13 at 129.)   In denying Petitioner's claim that counsel was ineffective for failing to call Quillen as a witness, "the court noted that Mr. Quillen was not present at the trials, that he was not present when the alleged acts occurred, and that he 'just gave generalized testimony that he believed the [P]etitioner could not be guilty.'"   *Breezee IV*, 2017 WL 1907738, at *4.

On appeal, Breezee argued, among other things, that the post-conviction court erred in rejecting his claim that the State should have disclosed the victim compensation payment.   *Id.* at *4, 6.   The TCCA refused to review the merits of the claim, finding that Breezee did not raise the issue by way of a petition for writ of error coram nobis.   *Id.* at *6.   Citing Tennessee Rule of Appellate Procedure 36(a), the court also found that Breezee also waived the claim by failing to "introduce the original [victim compensation] letter[] into evidence at the post-conviction hearing."   *Id.* (citing Tenn. R. App. P. 36(a)).

Petitioner also presented for the first time on appeal an argument that counsel rendered ineffective assistance by failing to call "Quillen to testify .  .  . about the victim['s] mother's infidelity, which would have allowed counsel to argue that she was not credible and that she had a motive to lie against the Petitioner."   *Id.*   The TCCA held that the argument was waived because Petitioner did not raise it in the court below.   *Id.*   The court also found that the claim was otherwise without merit.   *Id.*   Specifically, the court found that Quillen's testimony would not have impacted

the verdict because "the victims' mother admitted at the . . . first trial that she 'mess[ed] around' with a registered sex offender in 2007 while the Petitioner was working away from home," but the "jury convicted the Petitioner anyway[.]" *Id.*

### III.    Federal Habeas Proceedings

Breezee filed the Petition with this Court on November 6, 2017. He asserted that the evidence in both trials was insufficient to convict him of rape, rape of a child, and incest (Claim 1), the sentences were excessive under state law (Claim 2A) and under federal law (Claim 2B), and that he had newly discovered evidence that his ex-wife had feelings for D.W.'s father and that D.W. was "bribed" with victim compensation to testify against him (Claim 3). Petitioner also maintained that his defense attorney provided ineffective assistance by failing to argue that a comment by the prosecutor improperly influenced the jury (Claim 4A) and failing to call two witnesses at trial, including Petitioner's friend Ronnie Quillen, who would have testified that Chaney had been unfaithful and had told Quillen that she loved him (Claim 4B).

In support of Claim 3, Breezee submitted a copy of the victim compensation letter. (ECF No. 2 at 2-4.) The letter is dated August 27, 2010, which was one year before Breezee's trial relating to D.W. The correspondence is from the State of Tennessee Treasury Department, Division of Claims Administration. It is addressed to a "Karen Teem," and it states, in part, that "[t]he Division has approved the claim [of D.W.] and is prepared to make payment(s) as outlined on the attached list." (*Id.*) The attachment shows the sole "Payee" as "Benton Co Juvenile Ct Clk, FBO [D.W.]" and the amount of the award as $3000. (*Id.* at 4.) The letter goes on to state that the Payee will deduct a 5% administration fee from funds and "[t]he remaining amount will be deposited by the [Payee] in an interest bearing account for the benefit of the minor[.]" (*Id.* at 2.) It further specifies that "[t]he claimant can obtain moneys from the account only for certain limited

18

purposes and only by following certain procedures." (*Id.*)  Limited purposes include "unusual medical expenses incurred for the minor including, but not limited to, eyeglasses or braces, or for unusual educational opportunities for the minor, such as school field trips, or with good cause shown, other needs of the minor, provided such needs are not for normal expenses." (*Id.*)  The letter explains that "[W]hen the minor reaches age eighteen (18), the minor may receive all moneys from the account by sending a written request to the court clerk." (*Id.*)  Breezee also submitted the Benton County Juvenile Court's order establishing the trust for the benefit of D.W. (*Id.* at 5.)

By order dated December 11, 2020, the Court denied the Petition. (ECF No. 22.)  With regard to the *Brady* claim as it related to the nondisclosure of the victim compensation letter, the Court held that Petitioner had procedurally defaulted the issue.  Specifically, the Court held that the TCCA's application of two adequate and independent state procedural rules barred federal habeas review of the claim.  The ineffective-assistance claim relating to Quillen was likewise found to be procedurally defaulted.  The Court undertook an analysis under *Martinez v. Ryan*, 566 U.S. 1 (2012), and found that the default was not excused by post-conviction counsel's ineffective assistance because the claim was not "substantial."  The Court denied a COA.

Breezee appealed the denial of his claims.  The Sixth Circuit declined to grant a COA on most claims, but allowed Petitioner to proceed on his victim-compensation *Brady* claim and the Quillen ineffective-assistance claim.  (ECF No. 26.)  Regarding the *Brady* claim, the Court found that "[a] reasonable jurist could . . . debate whether the Tennessee Court of Criminal Appeals correctly ruled that state law barred consideration of [the] claim because [Petitioner] failed to raise it in a coram nobis petition." (*Id.* at 5.)  The Sixth Circuit also found that "[r]easonable jurists could . . . debate the district court's procedural ruling as to trial counsel's failure to call Quillen." (*Id.* at 8.)

After briefing by the parties, the Sixth Circuit affirmed the dismissal of the ineffective assistance claim, holding that the claim was not substantial so as to overcome the procedural default. In so deciding, the court first found that "Quillen's [testimony] that Chaney once told him that she loved him was unspecific as to the time and place of the statement." (ECF No. 28 at 8.) The court therefore determined that "there would have been no basis for a jury to conclude that Chaney was still in love with Quillen at the time of trial and that she therefore was fabricating her testimony in order [to] get rid of Breezee." (*Id.*) In addition, "the jury voted to convict Breezee despite being aware of Chaney's infidelity, so it is unlikely that a revelation that she told Quillen that she loved him at some unspecified point in time would have tipped the verdicts in his favor." (*Id.*) The court lastly noted that "Quillen's testimony would not have impeached D.W.'s account of the incident, which the jury obviously decided to credit," and that Breezee confessed to abusing D.W. (*Id.* at 9.)

Regarding the *Brady* issue, however, the Sixth Circuit held that the TCCA's decision to forego a review of the merits of the claim was not based on "an 'adequate and independent' state procedural rule and thus . . . the district court erred in ruling that it was procedurally defaulted." (*Id.* at 7.) The court declined Respondent's invitation to review the merits of the claim and "remand[ed] the . . . claim to the district court for consideration on the merits." (*Id.*)

## DISCUSSION

On remand, the Court ordered the parties to undertake additional briefing on the *Brady* claim. (ECF No. 29.) Petitioner filed a supplemental brief (ECF No. 33) and a supplemental reply (ECF No. 39). He argues that his "Brady claim should be remanded back to the Tennessee Court of Criminal Appeals due to the lack of subject matter jurisdiction within the Federal Court." (ECF No. 33 at 2.) He also maintains, alternatively, that his "Brady claim has merit because disclosure

of the payment to D.W. from the crime victims' fund WOULD have changed the outcome of the trial given the LACK of strength of the evidence against him, and relating solely to D.W., not B.J." (*Id.*)  Respondent filed a supplemental brief arguing that the Court should deny relief on the claim because it is without merit in light of the strength of the evidence produced by the State.  (ECF No. 38.)

**I**.   **Court's Jurisdiction**

Petitioner argues that the Court does not have subject matter jurisdiction over his *Brady* claim because the Tennessee Court of Criminal Appeals did not "rule on the merits" of the claim. (ECF No. 33 at 17.)  The position is not well taken.

The statutory authority for federal courts to issue habeas corpus relief for persons in state custody is provided by 28 U.S.C. § 2254.  The statute confers "subject-matter jurisdiction" in the federal courts over claims that a prisoner is "'in custody in violation of the Constitution or laws or treaties of the United States.'" *Davis v. Warren*, No. 18-1768, 2019 WL 3035577, at *2 (6th Cir. Feb. 19, 2019) (quoting 28 U.S.C. § 2254(a)).  The "adjudicated on the merits" language on which Breezee relies pertains only to the precondition for application of a set of "heightened [review] standards" under the statute.  *Jackson v. Smith*, 745 F.3d 206, 209 (6th Cir. 2014) (federal courts are to apply heightened standards of review "to 'any claim that was adjudicated on the merits in State Court proceedings.'") (quoting 28 U.S.C. § 2254(d)).  "By comparison, claims not 'adjudicated on the merits' by the state court are given plenary review by a federal habeas court[.]" *Id.* (citing *Jackson v. Houk*, 687 F.3d 723, 731 (6th Cir. 2012); *Wiggins v. Smith*, 539 U.S. 510, 534, (2003)); *see also Maslonka v. Hoffner*, 900 F.3d 269, 277 (6th Cir. 2018) ("Where state courts do not reach the merits of a habeas petitioner's claim, federal habeas review is not subject to the deferential standards …. Instead, de novo review applies.") (citing *Jackson*, 745 F.3d at 209).

21

By his *Brady* claim, Breezee alleges that he is in custody in violation of the United States Constitution. The fact that the TCCA did not adjudicate the claim on the merits does not divest this Court of subject matter jurisdiction to undertake a merits review. And because, as the Sixth Circuit found, the claim was presented to the TCCA but not barred by an adequate and independent state procedural rule, the claim is otherwise properly before this Court for review on the merits.

## II. Merits of Petitioner's *Brady* Claim

At the time Breezee was charged with rape of a child, that offense was defined as the "unlawful sexual penetration of a victim by the defendant . . . if the victim is more than three (3) years of age but less than thirteen (13) years of age." *Breezee I*, 2012 WL 6717308, at *5 (quoting prior version of Tenn. Code Ann. § 39-13-522(a)). "A person commits incest" when he "engages in sexual penetration . . . with a person, knowing the person to be, without regard to legitimacy . . . . [t]he person's . . . stepchild[.]" Tenn. Code Ann. § 39-1-302(a)(1)). "'Sexual penetration' means sexual intercourse, cunnilingus, . . . or any other intrusion, however slight, of any part of a person's body[.]" Tenn. Code Ann. § 39-13-501(7)).

In *Brady*, the Supreme Court held that a criminal defendant's right to due process is violated when prosecutors withhold from the defense evidence favorable to the accused, where the evidence is material either to guilt or punishment. *Brady*, 373 U.S. at 87. A *Brady* violation has three components: "the evidence at issue must be favorable to the accused. . . ; [the] evidence must have been suppressed by the State, either willfully or inadvertently; and prejudice must have ensued." *Owens v. Guida*, 549 F.3d 399, 415 (6th Cir. 2008) (quoting *Strickler v. Greene,* 527 U.S. 263, 281-82 (1999)).

Under the first *Brady* factor, evidence is "favorable" if it is "exculpatory, or . . . impeaching." *Id.* (quoting *Strickler*, 527 U.S. at 282). Evidence is not "suppressed," as required

by the second component, "if the defendant knew or should have known the essential facts permitting him to take advantage of the information in question or if the information was available to him from another source." *Hughbanks v. Hudson*, 2 F.4th 527, 537 (6th Cir. 2021) (quoting *Carter v. Bell*, 218 F.3d 581, 601 (6th Cir. 2000)), *reh'g denied* (Aug. 13, 2021), *cert. denied sub nom. Hughbanks v. Shoop*, 142 S. Ct. 1133 (2022).

"[T]he third *Brady* factor of prejudice [is] also described as the 'materiality' of the evidence." *Brooks v. Tennessee*, 626 F.3d 878, 891 (6th Cir. 2010) (citing *Strickler,* 527 U.S. at 282). "[E]vidence is material 'if there is a reasonable probability that, had the evidence been disclosed to the defense, the result of the proceeding would have been different.'" *Strickler*, 527 U.S. at 280 (quoting *United States v. Bagley*, 473 U.S. 667, 682 (1985)). "The Supreme Court has clarified that '[t]he question is not whether the defendant would more likely than not have received a different verdict with the [suppressed] evidence, but whether in its absence he received a fair trial, understood as a trial resulting in a verdict worthy of confidence.'" *Hughbanks*, 2 F.4th at 540 (quoting *Kyles v. Whitley*, 514 U.S. 419, 434 (1995)).

In undertaking "[t]he materiality inquiry," a court must "weigh[] 'the value of the undisclosed evidence relative to the other evidence produced by the state.'" *United States v. Ramer*, 883 F.3d 659, 672 (6th Cir. 2018) (quoting *Eakes v. Sexton*, 592 F. App'x 422, 427 (6th Cir. 2014). "[A] confession is strong evidence of [] guilt" that may preclude a finding of materiality. *Hughbanks*, 2 F.4th at 541 (quoting *Gumm* v. Mitchell, 775 F.3d 345, 371 (6th Cir. 2014)). However, the Sixth Circuit has "found that 'there are numerous reasons why a jury [might] discount[ ] Petitioner's statements to the police.'" *Id.* at 541-42 (quoting *Gumm*, 775 F.3d at 371.) Some reasons to discount a confession include circumstances suggesting that the petitioner did not have the "capacity to understand what was happening to him and challenge the legitimacy of his

statements" or the fact that "detectives consistently correct[ed] [the petitioner] when he offered details of the crime."  *Id.* at 542.

The Court finds that Breezee has met the first two *Brady* factors.  First, the victim compensation evidence was "favorable" to the defense as it relates to D.W.'s testimony. Respondent does not argue otherwise and it is clear that D.W.'s receipt of the funds supports, at least generally, a plausible inference that D.W. had a financial motive to lie.[3]  Second, it is undisputed that the State did not disclose the evidence.  Notably, Respondent has not argued that the information was discoverable by defense counsel through the exercise of reasonable diligence.

Both parties have limited their arguments to the third *Brady* factor—materiality.  Petitioner first contends that D.W.'s receipt of victim compensation funds is strong impeachment evidence because it gave D.W. a motive to lie about the rape.  He also insists that the prospect of D.W. receiving victim compensation provided Chaney with "a motive to lie on the witness stand [and] also gave her a motive to convince her children to lie on the witness stand, with hopes of pocketing $3000 dollars from the State for doing so."  (ECF No. 33 at 25.)  Breezee also proposes that, "had [the victim compensation] evidence been disclosed prior to trial, [he] would have most likely decided to testify in his own behalf, where he could have explained to the jury that any admissions (alleged confessions) were based on threats, intimidation, coercion, and scare tactics by investigators after [he] refuse[d] to confess[.]"  (ECF No. 39 at 4.)  He maintains that his testimony in that regard would be "fully supported by the record by the omission of any RECORDING and

---

[3] Petitioner argues that the information about D.W.'s receipt of victim compensation funds could have been used to impeach not only D.W., but also Chaney.  Respondent does not address the argument.  The Court will assume, without deciding, that the information about D.W.'s receipt of victim compensation funds is favorable to the defense in regard to Chaney's testimony.

the non-inclusion of almost ALL the questions during a two-day interview and the absence of all of the DENIALS [he] made during this time frame." (*Id.*)

Breezee further argues that the evidence produced by the State "was not overwhelming." (*Id.* at 1.) He maintains that (1) D.W., Chaney, and Penn's testimonies are not credible because each of these witnesses had a motive to lie, as shown by the evidence developed at trial; (2) he consistently denied at the first and second interviews that he raped D.W.; (4) Sgt. Pafford and Lt. Allen's testimonies regarding the second interview are not credible because "the tape recorder mysteriously broke" (*id.* at 7); (5) certain of Petitioner's statements at the second interview related to B.W., not D.W.; and (6) confessions to "touching" and "molesting" do not prove the crimes of rape or incest, which require proof of penetration.[4]

Respondent argues that the victim compensation information is not material. (ECF No. 38 at 3.) He maintains that "accredited trial testimony, separate and apart from DW's own clear testimony, proves Petitioner's guilt and prevents [Breezee] from establishing any 'reasonable probability' of a different outcome had information about the victim compensation fund been disclosed." (*Id.*) Respondent posits that "even if used as impeachment evidence against DW," the undisclosed information would have, at most, "created a 'mere possibility'" of different outcome. (*Id.* at 5 (quoting *Montgomery v. Bobby*, 654 F.3d 668, 678-79 (6th Cir. 2011) (citing *United States v. Agurs*, 427 U.S. 97, 109–10 (1976) ("The mere possibility that an item of undisclosed

---

[4] Petitioner also asserts that "[t]he State did not elect offenses to which they wanted to convict, resulting in confusion among the jury pool." (ECF No. 33 at 20.) The argument is rejected. In Tennessee, the prosecution must elect offenses when an indictment charges multiple sexual offenses occurring over a span of time. *State v. Brown*, 373 S.W. 3d 565, 574 (Tenn. Crim. App. 2011). At the trial involving Breezee's abuse of D.W., the State prosecuted only one incident of child rape and incest.

25

information might have helped the defense, or might have affected the outcome of the trial, does not establish 'materiality' in the constitutional sense.")).

Upon review of the parties' arguments, the records in this case, and the proof in the underlying state proceedings, the Court concludes that the undisclosed information is not material. More to the point, when the victim compensation evidence is viewed in the context of the evidence produced by the State, there is no reasonable probability that had D.W.'s receipt of the funds been disclosed to the defense, the result of the proceeding would have been different.

To begin, the victim compensation payment is not, as Petitioner contends, highly impeaching as to D.W. Firstly, as a general matter, "[r]eceiving victim compensation is not the kind of impeachment evidence that would necessarily discredit a witness." *Lagrone v. Parris*, No. 3:20-CV-406, 2023 WL 1081264, at *16 (E.D. Tenn. Jan. 27, 2023), *appeal filed* (6th Cir. Mar. 3, 2023) (finding victim compensation evidence was not material under *Brady*). That is so because, while a witness's receipt of such funds may give rise to an inference that the witness has a financial motive to lie, the fact that the witness was awarded such funds could also be consistent with her assertion that she is a victim. Relatedly, introduction of such evidence may open the door for the prosecution to bolster the witness's victim status. *See e.g.*, *Moore v. Marr*, 254 F.3d 1235, 1245 n.13 (10th Cir. 2001) (holding that undisclosed victim compensation payments were not material under *Brady*; the court found "enlightening with regard to [that] ultimate issue" defense counsel's testimony that "neither he nor any public defender he knew had ever sought the discovery of, or tried to use, victim compensation information to impeach a victim-witness's testimony" because "'[i]t can backfire'").

Secondly, the victim's compensation letter here shows that the funds for D.W. were approved one year before she testified at Breezee's trial, thereby undermining any suggestion that

approval of the funds depended upon the outcome of the trial.  Petitioner's assertion that D.W. could nevertheless have "los[t] the money" if she did not "stick to [her] original stor[y]," (ECF No. 39 at 13), is speculative and unsupported by the letter.  The letter states that the funds were to be placed in a trust held by the juvenile court as trustee and it makes no provision for the trustee's authority to withhold the funds if D.W. changed her "story."  There is, moreover, no evidence that D.W. knew about the possibility of receiving such funds at the time she first reported the abuse to the social worker and Sgt. Pafford, or that she was promised the funds in exchange for her testimony.  *See e.g. Anderson v. Tegels*, No. 11-CV-584-WMC, 2014 WL 3928564, at *11 (W.D. Wis. Aug. 12, 2014) (where petitioner did "not otherwise allege facts showing that the victim was promised the [compensation] in exchange for making her statement," he failed to "demonstrate that the [compensation] was material or that it influenced her statement in any way").

The value of the victims' compensation letter to impeach Chaney is even more limited. Petitioner argues that the prospect of victim compensation for D.W. incentivized Chaney to "lie on the witness stand" and "to convince her children to lie on the witness stand, with hopes of pocketing $3000 dollars from the State for doing so."  (ECF No. 33 at 25.)  The argument is speculative and undermined by the record.  Although on cross-examination Chaney referenced not having enough money to leave Breezee in 2007 after she witnessed the rape, Petitioner identifies nothing in the record to suggest that Chaney persuaded D.W. to lie so that she could "pocket" D.W's funds or that Chaney could even access the funds.  In fact, as discussed *supra*, D.W. explained on cross-examination and redirect that she did not speak with her mother about the rape, had little interaction with her after Breezee was charged, and had been living with her biological father during the time leading up to the trial.  (*See* ECF No. 15-14 at 130-133.)  Thus, the record does not suggest that Chaney persuaded D.W. to lie or that Chaney could have generated limited

purpose expenses on D.W.'s behalf—the only type of expenses reimbursable from the victim compensation funds.  And even if Chaney could have accessed the funds as a claimant seeking reimbursement for limited purpose expenses, by definition she would have had to pay those expenses first.  Thus, D.W.'s victim compensation funds could not have provided free money for Chaney.

Insofar as Breezee insists that disclosure of the victim compensation evidence would "most likely" have prompted him to testify as to police "threats, intimidation, coercion, and scare tactics," he fails to link that alleged misconduct to the undisclosed information.  In other words, he does not explain how D.W.'s receipt of the funds would contribute to a narrative that the officers obtained his inculpatory statements with illegal tactics.

The undisclosed information must also be assessed in the context of the evidence produced by the State.  The record first shows that D.W.'s testimony about the details of the rape is strongly corroborated by other witnesses.  D.W described the incident thusly: "I was asleep on the couch and I woke up with David—with my shorts and my undergarment on the floor next to the couch with David—with his head down between my legs. . . . He had his tongue in my vagina. . . . When I noticed I tried to push him off with my hands, but he took his hand and moved both my wrists to the side of the couch and took his other arm and moved his shoulder against my leg and pushed it out so I couldn't close them. [It ended when] My mom walked in."  (ECF No. 15-14 at 116-119.)  The details of the incident provided by D.W., including how Breezee managed to immobilize her during the rape, also appear in the eyewitness account given by her mother.  Chaney testified that D.W. "was laying on the couch.  She was pulled down just where her buttock was off the couch and David had her hands and he was between her legs where she couldn't move them." (*Id.* at 100-101.)  "David was licking her vagina and had his fingers in her." (*Id.* at 96.)  The abuse

stopped once Breezee realized Chaney was there. (*Id.*) On cross-examination of D.W., defense counsel probed the possibility that D.W. and her mother discussed, and therefore coordinated, their accounts of incident, but to no avail. (*Id.* at 130-133.)

Petitioner argues that D.W. and Chaney's testimonies are weak for other reasons. Regarding D.W., he points out that it is undisputed that she denied the abuse in 2009; that her testimony that Breezee beat her suggests "a motive to lie for the purpose of getting even with Petitioner, and to get out of an abusive relationship"; and that she lied about not having a boyfriend and, therefore, her testimony that she was not fabricating her story about the abuse as a way to get back at Breezee for moving her away from her boyfriend should not be believed. (ECF No. 33 at 24.) The jury, however, heard all of that impeaching evidence and nevertheless found D.W. to be credible.

As for Chaney, Petitioner argues that she had motives to lie about the rape in order to get rid of Breezee. Specifically, he maintains that she was "in love with another man," (ECF No. 33 at 24), "was cheating on Petitioner, [and] was afraid of Petitioner due to previous threats to kill her, and she had no money to move." (ECF no. 39 at 12). Petitioner's allegation that Chaney was in love with someone else is presumably in reference to the love letter from Chaney to D.W.'s biological father professing her love. But because the letter is not dated, (*see* ECF No. 15-31 at 10; ECF No. 15-30 at 54-59), it is, like Quillen's vague testimony that Chaney said she loved him, "unspecific as to . . . time and place[.]" (ECF No. 28 at 8.) Therefore, "there would have been no basis for a jury to conclude that Chaney was still in love with" D.W.'s father "at the time of trial and that she therefore was fabricating her testimony in order [to] get rid of Breezee." (*Id.*) In addition, the jury heard Chaney admit on cross-examination to being unfaithful to Petitioner, that she did not have money to move in 2007 after the rape occurred, and that she was afraid of Breezee

because he threatened to kill her. Chaney's credibility was therefore challenged on these grounds but the jury implicitly found her testimony to be credible.

What is more, both DW's and Chaney's descriptions of the abuse match in large part the details of Breezee's jailhouse confession to Penn. Penn testified that he heard Petitioner say that D.W. was "asleep" on the couch and Breezee "went to the couch, climbed up with [DW], pinned her in, started doing it. The oral." (ECF No. 15-14 at 80, 81.) Petitioner points out that Penn's account differed from those of DW and Chaney in one detail: Penn said that Petitioner "climbed up" on the couch, while D.W. and Chaney testified that Petitioner was kneeling on the floor during the rape. However, the other details Penn provided—D.W. was on a couch, Breezee held her down, and Breezee performed oral sex on her—are the same details provided by D.W. and Chaney. Therefore, Penn's testimony does not materially differ from the testimonies of the eyewitnesses.

Importantly, Penn testified before DW and Chaney testified and witnesses were excluded from the courtroom when not testifying. (*See* ECF No. 15-14 at 3, 5, 15.) Petitioner nevertheless makes much of the fact that Penn, as Petitioner's cellmate, had access to Breezee's General Sessions Warrant, which charged rape on D.W. "by performing oral sex on her when she was 12 years old." (ECF No. 15-14 at 91.) On cross-examination, however, defense counsel did not establish that Penn looked at the warrant, and Penn, for his part, persisted in his assertion that Breezee had confessed to details of the abuse. The jury also heard information about Penn's other possible motivations for lying, such as that he had a grudge against Petitioner and that he regained custody of his child and a light sentence for the assault after he informed Curtis about Petitioner's confession. The jury, however, found his testimony to be credible.

At bottom, despite the existence of evidence that each of these witnesses—D.W., Chaney, and Penn—may have had a motive to lie, their testimonies are highly corroborative in their details

of the rape and there is no evidence that they coordinated their accounts or garnered details from other sources.

That leaves evidence related to the events during and after the second interview. Petitioner first argues that the Written Statement from the second interview contains proof that he "denie[d] having oral sex on [D.W.]" (ECF No. 33 at 7.). He says his denial is found at Paragraph 1. (*Id.*) That paragraph reads: "Why did you do orel [sic] sex on D[]? I don't know, I don't remember that." (ECF No. 15-15 at 2.) Breezee maintains that this "denial" is especially important because it is consistent with his steadfast protestations of innocence at the first interview and with his statement at second interview, as recorded at Paragraph 7, that he did not "penetrate" D.W. (ECF No. 15-15 at 2.) The argument is rejected because Petitioner's assertion that he "denied" performing oral sex on D.W. is misplaced. Saying "I don't know" or "I don't remember" is not a denial. Indeed, those remarks could be viewed by a jury as somewhat incriminating.

Also unavailing is Breezee's argument that evidence from the second interview is suspect because "the tape recorder mysteriously broke." The assertion is nothing but speculation that the officers intentionally did not record the interview. It is therefore insufficient to call into question the officers' testimonies that the recording device was simply not working.

Petitioner's most substantial challenge is to the value of certain comments he made at the second interview. The remarks are found in the Written Statement at Paragraphs 4 and 10. In Paragraph 4, Breezee stated "I don't know" to the question "What are we going to do to help you?" (ECF No. 15-15 at 2.) In Paragraph 10, he remarked "I don't know what I was thinking" to the query "Did you not think when you were touch [sic] the girl that it would not hert[]?" (*Id.* at 3.) Breezee asserts that the Written Statement contained redactions that omitted references to B.W., such that a review of the unredacted version will show that his statements at Paragraphs 4 and 10

referred to B.W., not D.W.  Respondent points out that the judge at Breezee's trial relating to D.W. considered defense counsel's similar challenge to some of the redactions but found that confessions contained in the Written Statement plausibly related to D.W.  (ECF No. 38 at 7.)

The Court has reviewed the Written Statement, as submitted into evidence as Exhibit 1, (ECF No. 15-15 at 2-3), and compared it to the unredacted version, which was not admitted into evidence but was marked as Exhibit 1A, (*id.* at 4-5).  The documents do not show, as Breezee insists, that he could *only* have been referring to B.W. when he made the statements in Paragraphs 4 and 10.  In arguing that Paragraph 4 relates only to B.W., Petitioner relies on the fact that Paragraph 3, which undisputedly relates only to B.W., immediately precedes Paragraph 4.  But Paragraph 4 is also preceded by Paragraph 1, wherein, as discussed above, Petitioner states "I don't know, I don't remember that" to the question "Why did you do orel [sic] sex on D[]?"  It is also preceded by Paragraph 2, which could relate to either or both of the girls.  (*Id.* at 4 ("Are you jeaous [sic] of the boyfriend's [sic]?  No, that a part of growing up.").)  Furthermore, Paragraph 4 is followed by Paragraph 5, which could relate to either or both of the girls, and then by Paragraph 6, which, in the unredacted version, references "the girls," plural.  (*Id.* (Par. 5; "Do you not think your side should be told? Yes."; Par. 6: "If you was going to fix the girls how would you fix them? I don't know.").)  Therefore, when viewed in context, Paragraph 4 could plausibly relate to B.W. alone—for the reason Breezee provides—or to both B.W. and D.W.  Petitioner makes a similar argument as to Paragraph 10.  However, a comparison of the documents shows that, although the question at that paragraph refers to "the girl," singular, the word "them" was redacted from the end.  (*Compare id.* at 3 with *id.* at 5 ("Did you not think when you were touch [sic] the girl that it would not hert [sic] them?  I don't know what I was thinking.").)  Paragraph 10 therefore gives rise to two plausible inferences: that Petitioner was referring to B.W.—again, for the reason

Breezee cites—or to both girls.  Therefore, although Petitioner overstates his case, the Court finds that the value of Breezee's statements in Paragraphs 4 and 10 should be discounted to some extent due to the existence of plausible alternative interpretations.

But even if the Court were to disregard those statements in their entirety, or even disregard every incriminatory remark in the Written Statement, Sgt. Pafford and Lt. Allen testified that Breezee lowered his head at the end of the interview and said he did not know why he touched "the girl" and Curtis testified that Breezee confessed, while smoking outside, to molesting D.W.

Petitioner insists that his end-of-interview and smoking-break confessions only related to B.W., not D.W.  In support, he points out that the officers testified at the trial concerning B.W. that he confessed to abusing B.W. at the end of the second interview and that Curtis testified at that trial that she heard him confess to molesting B.W. during smoking break.

The argument is rejected.  Testimony in the B.W. trial that Petitioner referred to B.W. during those confessions, and testimony in the D.W. trial that he referred to D.W., are not necessarily mutually exclusive.  More to the point, on Breezee's own motions, the trials were severed and the State's witnesses were prohibited from referencing the other victim.  (*See* ECF No. 15-1 at 14 (motion for "an order instructing the District Attorney General, his Assistants, and the witnesses for the prosecution not to mention, allude or refer to any sexual acts allegedly committed by the defendant against D[] . . . W[]."); ECF No. 15-1 at 19 (order directing "that the State of Tennessee and its witnesses are prohibited in its statements and testimony from referring to any other sexual acts allegedly committed by the defendant, David Breezee, that are not set forth in the indictments alleged by B[] . . . J[] . . . W[]. . . to have occurred on February 24, 2010".); ECF No. 15-14 at 22-23 (jury-out hearing at trial relating to D.W. to omit references to B.W. in the Written Statement).)  Indeed, a comparison of the testimonies of Pafford, Allen, and Curtis at the

trial relating to B.W. with their testimonies at the trial concerning the rape of D.W. shows that each of these witnesses omitted details relating to the victim not at issue in each case.[5]  Given that context, Petitioner must do more than simply point out the fact that the officers and the social worker only referred to the relevant victim at each trial when describing Breezee's end-of-interview and smoking-break confessions.

In the alternative, Breezee argues that those confessions have no evidentiary value because they relate only to "touching" and "molesting," neither of which is "penetration."  (ECF No. 39 at 8.)  Although Petitioner is correct that the State was required to prove that he penetrated D.W., his admissions to touching and molesting D.W. bolster the more particularized evidence produced by the State—*i.e.*, details from D.W., Chaney, and Penn about Breezee's penetration of D.W.'s vagina with his tongue and Chaney's further testimony that Breezee also digitally penetrated D.W.  For this same reason, Petitioner's identical argument as to the evidentiary value of his several references in the Written Statement to "touching" is also unavailing.

In sum, the State produced highly compelling and damaging evidence that Petitioner raped D.W. and committed the offense of incest.  Based on this record, the Court concludes that there is no reasonable probability that had D.W.'s receipt of the victim compensation funds been disclosed to the defense the result of the proceeding would have been different.  Stated differently, the State's failure to disclose the victim compensation evidence is insufficient to undermine confidence in the outcome of the trial.  As the victim compensation evidence is not material, Petitioner's *Brady* claim is without merit and is **DENIED**.

---

[5] Penn's jailhouse-confession testimony at each trial was also limited to the relevant victim. (*Compare* ECF No. 15-2 at 72 ("Q. "What did [Breezee] say?  Only referring to B.J.[].  A. Something along the lines of how she wanted him to do it to him.") *with* ECF No. 15-14 at 81 (describing Breezee's jailhouse confession about his abuse of D.W., but not mentioning his confession regarding B.W.).)

The Petition is hereby **DENIED**.  Judgment shall be entered for Respondent.

## APPEAL ISSUES

A § 2254 petitioner may not proceed on appeal unless a district or circuit judge issues a COA.  28 U.S.C. § 2253(c)(1); Fed. R. App. P. 22(b)(1).  A COA may issue only if the petitioner has made a substantial showing of the denial of a constitutional right.  28 U.S.C. § 2253(c)(2)-(3). A substantial showing is made when the petitioner demonstrates that "reasonable jurists could debate whether (or, for that matter, agree that) the petition should have been resolved in a different manner or that the issues presented were 'adequate to deserve encouragement to proceed further.'" *Miller-El v. Cockrell,* 537 U.S. 322, 336 (2003) (quoting *Slack v. McDaniel,* 529 U.S. 473, 484 (2000)).  "If the petition was denied on procedural grounds, the petitioner must show, 'at least, that jurists of reason would find it debatable whether the petition states a valid claim of the denial of a constitutional right and that jurists of reason would find it debatable whether the district court was correct in its procedural ruling.'"  *Dufresne v. Palmer*, 876 F.3d 248, 252-53 (6th Cir. 2017) (per curiam) (quoting *Slack*, 529 U.S. at 484).

In this case, reasonable jurists would not debate the correctness of the Court's decision to deny the Petition.  Because any appeal by Petitioner does not deserve attention, the Court **DENIES** a certificate of appealability.

Pursuant to Federal Rule of Appellate Procedure 24(a), a party seeking pauper status on appeal must first file a motion in the district court, along with a supporting affidavit.  Fed. R. App. P. 24(a).  However, Rule 24(a) also provides that if the district court certifies that an appeal would not be taken in good faith, the prisoner must file his motion to proceed *in forma pauperis* in the appellate court.  *Id.*

In this case, for the same reason it denies a COA, the Court **CERTIFIES**, pursuant to Rule 24(a), that any appeal in this matter would not be taken in good faith.  Leave to appeal *in forma pauperis* is therefore **DENIED**.[6]

**IT IS SO ORDERED**.

**s/ S. Thomas Anderson**
S. THOMAS ANDERSON
UNITED STATES DISTRICT JUDGE

Date: July 5, 2023.

---

[6] If Petitioner files a notice of appeal, he must also pay the full $505.00 appellate filing fee or file a motion to proceed *in forma pauperis* and supporting affidavit in the Sixth Circuit Court of Appeals within thirty days.

36